**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**Case No. 1:19-cv-23856-RNS**

URI MARRACHE, individually and on
behalf of all others similarly situated,

       Plaintiff,

v.

BACARDI U.S.A., INC., a Delaware corporation
d/b/a THE BOMBAY SPIRITS COMPANY
U.S.A.; and WINN-DIXIE SUPERMARKETS,
INC. d/b/a WINN DIXIE LIQUORS,

       Defendants.

_____/

**DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

       Defendants Bacardi U.S.A., Inc. ("BUSA") and Winn-Dixie Supermarkets, Inc. ("Winn-Dixie" and together, "Defendants"), by and through undersigned counsel, move to dismiss the Amended Complaint. In support thereof, Defendants state as follows:

**I.    BACKGROUND**

       Plaintiff's Amended Complaint impliedly alleges that he purchased the product at some unidentified Winn-Dixie in Florida. (Am. Compl. ¶ 24 ("Winn-Dixie knowingly sold the adulterated Liquor to the Plaintiff in Florida."); *id.* ¶ (stating the Plaintiff and members of the class "purchas[ed] Bombay Sapphire ® gin from Defendants at WINN-DIXIE")). But Plaintiff does not say exactly where or when he bought the "Adulterating Liquor" (only in the last four years), what exactly he bought, and does not provide ascertainability, such as proof of purchase. He further alleges that Grains of Paradise is identified in a Florida statute dealing with adulteration. (*Id.* ¶ 21). He does not allege that Grains of Paradise is poisonous or deleterious to health. In fact he states it is used for "medicinal purposes." (*Id.* ¶ 19). He further alleges that BUSA's bottle of Bombay Sapphire Gin has Grains of Paradise, as an ingredient, etched on the bottle (*Id.* ¶¶ 14-15). He alleges that Winn-Dixie sold, and BUSA produced, the "Adulterated

Product." (*Id*. ¶¶ 14, 24).  He alleges both *per se* and non-*Per Se* violations of FDUTPA (*Id*. ¶¶ 38, 43, 49).  He alleges no harm to himself.  He also alleges no misleading or false statements by either Winn-Dixie or BUSA.  The Amended Complaint must be dismissed with prejudice.

## II.  ARGUMENT

### A.  PLAINTIFF'S FDUTPA CLAIMS MUST BE DISMISSED WITH PREJUDICE

#### 1.  Legal Standard

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Fla. Stat. § 501.204(2).  FDUTPA includes a limited private right of action for consumers buying goods or services.  *Parr v. Maesbury Homes*, No. 6:09-cv-1268-Orl-19GJK, 2009 WL 5171770, *6-8 (M.D. Fla. Dec. 22, 2009).  This private right of action states:

> In any action brought by a person ***who has suffered a loss as a result of a violation of this part***, such person may recover ***actual damages***, plus attorney's fees and court costs as provided in s. 501.2105. However, damages, fees, or costs are not recoverable under this section ***against a retailer*** who has, in good faith, engaged in the dissemination of claims of a manufacturer or wholesaler without actual knowledge that it violated this part.

Fla. Stat. § 501.211(2) (emphases added).  "Under Florida law, plaintiffs alleging a FDUTPA violation must prove: (1) a deceptive or unfair practice; (2) causation; and (3) actual damages."  *Parr*, 2009 WL 5171770, at *7.

With respect to deception, the Florida Supreme Court has noted that "deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably under the circumstances, to the consumer's detriment."  *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).  This standard requires a showing of "probable, not possible, deception."  *Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen., Dep't of Legal Affairs, State of Fla.*, 761 So. 2d 1256, 1263 (11th Cir. 2000).

With respect to unfairness, the term "unfair" is not defined in FDUTPA.  *Porsche Cars N.A., Inc. v. Diamond*, 140 So. 3d 1090, 1096 (Fla. 3d DCA 2014).  Florida, however, adopts the definition provided by the FTC.  *Id.* at 1097.  The "three-pronged test for 'unfairness,' [ ] requires that the injury to the consumer: (1) must be substantial; (2) must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) must

be an injury that consumers themselves could not reasonably have avoided."[1]  *Id*. (noting that the "Florida Legislature amended FDUTPA in 1983, 2001, 2006, and 2013, for the specific purpose of adding to Florida Law interpretations by the Federal Trade Commission or federal courts that occurred since the last statutory amendment").

Under § 501.203(3)(c), statutes may be found to serve as predicates for a FDUTPA claim in one of two ways.  "First, the text of a statute may expressly state that it is to serve as a FDUTPA predicate," meaning a *per se* violation.  *Parr*, 2009 WL 5171770, at \*7.  "Where a particular statutory violation is found to constitute a *per se* violation of FDUTPA, it is presumed that the violation constitutes a deceptive or unfair practice" and therefore it is unnecessary to allege the first element of FDUTPA.[2]  *Id*. at 8.

"Second, a court may find that a statute proscribes unfair and deceptive trade practices and therefore operates as an implied FDUTPA predicate," meaning a non-*per se* violation.  *Id*. at 7.  "However, regardless of whether a statute is a *per se* FDUTPA predicate or alleged to proscribe a [non-*per se*] unfair or deceptive practice and therefore serve as an implied FDUTPA predicate, a plaintiff is still required to plead the remaining two elements, causation and damages, in order to properly state a claim for a FDUTPA violation."  *Id*. at 8.

FDUTPA also contains a safe harbor provision that exempts conduct from violating FDUTPA if it is an "act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1).  FDUTPA also requires that great weight be given to the federal deceptive and unfair trade practices statute: "It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the

---

[1]      Of course, since Grains of Paradise was etched into the bottle, and a party is on notice of Florida statutes, the consumer could have avoided any potential issue by not buying the product.  *Porsche Cars*, 140 So. 3d, at 1099-99.

[2]      Section 562.455, a criminal statute, which is the predicate statute for Counts I and II concerning adulterated liquor, does not include any language expressly stating that it qualifies as a *per se* FDUTPA predicate.  Similarly, § 500.04(1)-(3), which is the predicate statute for Count III concerning adulterated food, does not include any language expressly stating that it qualifies as a *per se* FDUTPA predicate.  In contrast, other Florida statutes clearly include this express language.  *See, e.g.*, Fla. Stat. § 400.464(4)(c) ("A violation of paragraph (a) or s. 408.812 is a deceptive and unfair trade practice and constitutes a violation of the Florida Deceptive and Unfair Trade Practices Act.").  Fatal to Plaintiff's claim, §§ 562.455 and 500.04(1)-(3) contain no private right of action whatsoever.  Therefore, Plaintiff cannot seek relief under the statutes he invokes.

Federal Trade Commission and the federal courts relating to [15 U.S.C. § 45(a)(1)] of the Federal Trade Commission Act."  Fla. Stat. § 501.204(2).

### 2. Plaintiff Fails To Adequately Allege A Deceptive Or Unfair Trade Practice

#### a. Plaintiff Does Not Allege Any Facts Supporting Adulteration Of The Product With Grains Of Paradise

Plaintiff's claims fail because the Amended Complaint does not state any facts reflecting how Grains of Paradise adulterates Bombay Sapphire Gin.  Section 562.455, on which Counts I and II are based, does not define "adulterated."  However, § 500.10, on which Count III is based, provides the conditions under which food will be deemed to be adulterated, including for example: (1) "If it bears any poisonous or deleterious substance which may render it injurious to health"; and (2) "If it bears or contains, any *food additive* which is unsafe within the meaning of 21 U.S.C. s. 348 or s. 500.13(1)."  (emphasis added).  This definition is consistent with the Federal Food Drug and Cosmetics Act, under which a food is deemed adulterated if it "bears or contains any poisonous or deleterious substance which may render it injurious to health," or if it bears any food additive that is unsafe.  21 U.S.C. § 342(a)(1) and (2)(C).  This is consistent with the only Florida case, a criminal case, addressing the application of § 562.455 (which, again, is a criminal statute).  *See Coston v. State*, 190 So. 520, 522 (Fla. 1939); *Coston v. State*, 198 So. 467, 469 (Fla. 1940) (holding that Coston feloniously adulterated whiskey with potassium cyanide and the person who consumed it drank it and died).

Here, the Amended Complaint does not allege what form or amount of Grains of Paradise are in Bombay Sapphire Gin, but only that the words Grains of Paradise are etched on the bottle. More importantly, there is no allegation whatsoever that Grains of Paradise made the product poisonous or deleterious to health, or that Plaintiff experienced any adverse effects related to Grains of Paradise.  *United States v. Lexington Mill & Elevator Co.*, 232 U.S. 399, 399, 412 (1914).  As the U. S. Supreme Court held, many ingredients can be considered "poisonous" (which Grains of Paradise is not), but it depends on the quantity and combination to determine if the addition of that ingredient makes the product injurious to health.  Therefore, it is not the mere inclusion of such an ingredient in a product that makes a product "adulterated," but a determination of whether the amount or combination of that ingredient in the product makes that product injurious to health.  *Id.*

4

Further, the Amended Complaint does not allege that the product contains any unsafe food additive.[3] Nor could Plaintiff support such an allegation, as the definition of food additive under both federal and Florida law expressly excludes GRAS ("generally recognized as safe") substances, and both federal and Florida law recognize Grains of Paradise as a GRAS substance for use as a spice or flavoring ingredient. 21 U.S.C. § 321(f); Fla. Stat. tit. XXXIII, § 500.03(o). Grains of Paradise, therefore, is not a food additive, let alone an unsafe food additive.

Here, the Amended Complaint must also be dismissed because Plaintiff offers no definition of "adulteration" or acts that qualify as "adulteration." *See Salters v. Beam Suntory Inc.,* No. 4:14-cv-659, 2015 WL 2124939 (N.D. Fla. May 1, 2015) (dismissing FDUTPA claim in class action alleging that Maker's Mark falsely represented that it is "handmade"). As in *Salters,* Bombay Sapphire is not "adulterated" merely because it has Grains of Paradise etched on the bottle. There are no allegations that the product at issue actually contains any amount of Grains of Paradise that would cause injury (much less facts supporting how such a determination was made), and there are no allegations that the plaintiff suffered any adverse effects from Grains of Paradise. If the Plaintiff consumed the product, as he alleges, he certainly received what he paid for. *See Meyer v. Colavita USA Inc.*, No. 10-61781-CIV, 2011 WL 13216980, at *5 (S.D. Fla. Sept. 13, 2011) ("unwarranted deductions of fact" failing to allege a misrepresentation, are insufficient to support a FDUTPA claim alleging that the sale of food product was unfair or deceptive); *see also Mazzeo v. Nature's Bounty, Inc.*, No. 14-60580, 2014 WL 5846735, at *3 (S.D. Fla. Nov. 12, 2014) (conclusory allegations were insufficient to support FDUTPA claim). Therefore, the Amended Complaint fails to adequately allege adulteration of the product with Grains of Paradise.

---

[3]     Notably, Grains of Paradise is deemed safe for human consumption by state, federal, and international laws, rules, and regulations. The Code of Federal Regulations lists Grains of Paradise as a spice or seasoning that is "generally recognized as safe" for human consumption. 21 C.F.R. § 182.10. Many states, including Florida, incorporate, adopt or defer to federal regulations on spices and seasonings that are generally recognized as safe for human consumption. *See* Fla. Admin. Code R. 5K-4.002(d) (stating the FDA regulations at 21 C.F.R. Parts 111-190 are "hereby incorporated and adopted as rules under the Florida Food Act"). Grains of Paradise is also listed as GRAS under the Flavoring and Extract Manufacturers Association ("FEMA") list of GRAS flavoring substances, the longest running and most widely recognized industry GRAS assessment program. *See* FEMA GRAS Flavor Library, Grains of Paradise,       https://www.femaflavor.org/flavor-library/grains-paradise-aframomum-melegueta-rosc-k-schum. Indeed, Grains of Paradise is sold as a spice for cooking at many stores, such as Wal-Mart. *See* Larissa Veronica Grains of Paradise Spice for sale at Wal-Mart (attached as Ex. 1).

**b.** **There are No Claims of Deceptive Acts, And Truthful Representations Cannot Support A FDUTPA Claim**

The Amended Complaint makes no claims of deceptive acts by either Defendant, and the product at issue is not deceptive.  The item Plaintiff complains about, Grains of Paradise, is etched on the bottle.  Ironically, Plaintiff's allegations do not rest on any deception, but rather on truthfulness, namely, the fact that Grains of Paradise is identified on the bottle itself.   The Plaintiff's Amended Complaint cannot be squared with Florida law which requires that "under FDUTPA, [p]laintiffs suffered damages when they purchased something that was not what they were led to believe they were purchasing." *Point Blank Solutions v. Toyobo Am. Inc.*, No. 09-61166, 2011 WL 1833366, at *6 (S.D. Fla. May 13, 2001).  Further, "[t]he Florida Supreme Court has noted that deception occurs if there is a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Zlotnick v. Premier Sales Corp. Inc*., 480 F. 3d 1281, 1284 (11th Cir. 2007)).  Every element must be alleged and proven.  *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008).

No "deceptive" act is alleged because the Bombay Sapphire Gin bottle identifies Grains of Paradise, etched on the bottle.  Plaintiff's claim is based on the truthfulness of the BUSA representations, since no deception is alleged.  Plaintiff could have simply avoided any issue by not purchasing the product.

This is similar to *Millennium*, where a company sent out postcards advising consumers that they could receive a credit card with a $4,000 limit.  761 So. 2d at 1264.  The State of Florida sued the company under FDUTPA claiming that the postcard was deceptive because it led consumers to believe they were eligible for a Visa or MasterCard, even though the postcard said nothing about either.  *Id*.  Relying on the Federal Trade Commission's standard for deception, which is "a representation, omission or practice that is likely to mislead the consumer acting reasonably under the circumstances to the consumer's detriment," the Eleventh Circuit found nothing deceptive about the postcard because it was truthful.  *Id*. at 1263-64; *see also Lombardo v. Johnson & Johnson Consumer Co's.*, 124 F. Supp. 3d 1283, 1287-88 (S.D. Fla 2015) (finding that failure to allege "misleading statement" and an actual loss required dismissal of FDUTPA claim, and also that the claims were preempted); *Feheley v. LAI Games Sales, Inc.*, No. 08-23060-CIV, 2009 WL 2474061 at *5 (S.D. Fla. Aug. 11, 2009) (holding that

manufacturer of gambling game did not engage in any unfair or deceptive act because the plaintiffs "allegations depends entirely, not on the deceptiveness of these [marketing] materials, but on their *truthfulness*," dismissing case with prejudice) (emphasis in original); *DeBernardis v. IQ Formulations, LLC*, No. 17-cv-21562, 2018 WL 1536608, at *3 (S.D. Fla. Mar. 29, 2018) (dismissing FDUTPA claim where plaintiffs did not allege that the products with an allegedly unlawful ingredient "failed to perform as advertised or caused adverse health effects").[4] *DeBernardis* is similar to the Plaintiff's claim because there, the plaintiff alleged that the product contained an unlawful ingredient, but did not allege that it harmed him.[5]

Here, there is no allegation that the Defendants misled consumers, since Grains of Paradise was etched on the bottle.[6] Moreover, even though the Amended Complaint fails to allege that the product actually contains any particular amount of Grains of Paradise, the crux of Amended Complaint is the alleged adulteration of the product with Grains of Paradise. However, the etching of Grains of Paradise on the outside of the bottle is a truthful representation, not a misrepresentation. Therefore, just like in *Millennium, Lombardo, DeBernardis, and Feheley*, Plaintiff's FDUTPA claim is based on a truthful representation which cannot support a FDUTPA claim.

### c. Plaintiff's Claim Falls Within FDUTPA's Safe Harbor

The sale of Bombay Sapphire Gin falls within FDUTPA's safe harbor provision, which exempts from any FDUTPA violation an "act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1). The use of Grains of Paradise is permitted by state and federal statutes. First and foremost, the Code of Federal Regulations lists Grains of Paradise as a spice or seasoning that is "generally recognized as safe" for human consumption. 21 C.F.R. § 182.10. Grains of Paradise is also listed as safe for human consumption by the Codex Alimentarius, and is also listed as "generally recognized as safe" ("GRAS") under the Flavoring

---

[4] Nor can a manufacturer who sells to wholesalers be held liable for FDUTPA, where there are no allegations that the manufacturer made misrepresentations to the consumer. *See Feheley,* 2009 WL 2474061 at *5.

[5] Under consumer acts, the claim requires a representation that the goods have characteristics, ingredients or uses which they do not have. *Tae Hee Lee v. Toyota Motor Sales,* 992 F. Supp. 2d 962, 971-74 (C.D. Ca. 2014). Thus, in the absence of any statement by BUSA or Winn Dixie that misrepresents the product, no FDUTPA claim can be made.

[6] Plaintiff has not brought a failure to warn case, nor could he. *Bruner v. Anheuser-Busch Inc*., 153 F. Supp. 1358, 1360 (S. D. Fla 2001).

7

and Extract Manufacturers Association ("FEMA") list of GRAS flavoring substances, the longest running and most widely recognized industry GRAS assessment program.  *See* fn. 3, *supra*. (citing statutes).

Notably, Florida defers to federal regulations on spices and seasonings that are generally recognized as safe for human consumption. Fla. Admin. Code R. 5K-4.002(d) (stating the FDA regulations at 21 C.F.R. Parts 111-190 are "hereby incorporated and adopted as rules under the Florida Food Act"). As such, the use of Grains of Paradise is expressly permitted by federal law and state law and thus falls within FDUTPA's safe harbor. This is especially true absent any allegations that the product is actually adulterated, meaning poisonous or deleterious. This safe harbor provision provides that a FDUTPA claim cannot be premised on "[a]n act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1); *see, e.g.*, *Montero v. Duval Cty. Sch. Bd.*, 153 So. 3d 407, 412 (Fla. 1st DCA 2014) (holding that a FDUTPA claim against a school board failed because the board's action was required or specifically permitted by state law); *Prohias v. AstraZeneca Pharmaceuticals, L.P.*, 958 So. 2d 1054, 1056 (Fla. 3d DCA 2007) (finding that a plaintiff's claim fell into FDUTPA's safe harbor and failed to state a FDUTPA claim where the defendant's drug labeling complied with FDA requirements). *See also Pye v. Fifth Generation, Inc.*, No. 4:14CV493-RH/CAS, 2015 WL 5634600, at *3-4 (N.D. Fla. Sept. 23, 2015) (finding that the safe harbor provision of FDUTPA protects alcohol labeling based on the federal government's approval of the label – Bombay Sapphire Gin has the same governmental approval);[7] *Brunson v. Gulf Coast Elec. Coop., Inc.*, No. 2015-CA-000063 (Fla. Cir. Ct. Oct. 7, 2016) (attached as Ex. 3).

### d.  Plaintiff Has Failed To Allege A *Per Se* Or Non-*Per Se* FDUTPA Violation

In Florida, a party has no standing to sue a defendant for criminal violations, without more. *Feheley,* 2009 WL 2474061 at *5. Florida law is clear that a *per se* FDUTPA violation can only be based on the violation of a predicate statute that expressly states that its violation constitutes a FDUTPA violation. *Parr*, 2009 WL 5171770, at *7 (citing §§ 400.464(4)(c) and 400.93(6)(a) as examples of statutes that can serve as the predicate for a *per se* FDUTPA violation because they contain express language stating that a violation of the statute also constitutes a FDUTPA violation); *see also Feheley*, 2009 WL 2474061, at *4 (finding that Florida Statute § 849.15 fails to serve as *per se* FDUTPA predicate because it does not include

---

[7]      See COLA label approval for Bombay Sapphire Gin, attached as Ex. 2.

express language to that effect).  Here, Plaintiff's FDUTPA claims do not, and cannot, rely on a *per se* violation of FDUTPA, which requires a predicate statute with express language.

Section 500.04(1)-(3), concerning adulterated food, includes no language expressly stating that its violation constitutes a *per se* FDUTPA violation.  Likewise, § 562.455, concerning adulterated liquor, does not expressly state that its violation constitutes a *per se* FDUTPA violation.  Further, § 562.455 is a criminal statute that does not support a *per se* FDUTPA violation.  *See Feheley*, 2009 WL 2474061, at *4 (holding that an alleged violation of § 849.15, Fla. Stat., a criminal statute, did not support a FDUTPA claim).  Therefore, Plaintiff's FDUTPA claims must be dismissed because the statutes referred to in the Amended Complaint do not support a *per se* violation.

Moreover, with respect to § 562.455, Florida courts have rejected the premise that a violation of a criminal statute supports a non-*per se* FDUTPA violation.  For example, in *Feheley*, the court rejected the notion that the purported violation of a criminal statute violates FDUTPA.  *Feheley*, 2009 WL 2474061, at *4 ("Taken to an extreme, it would morph almost any Florida criminal statute into a FDUTPA predicate, except those specifically exempted by § 501.202. The Court finds this extremely broad reading of FDUTPA unsupported by law.").  Therefore, the purported violation of a criminal statute does not serve as a predicate for a non-*per se* FDUTPA violation.  Further, § 562.455 has never been the predicate for a *per se* or non-*per se* FDUTPA claim, a fact that weighs heavily in the analysis of courts determining whether the violation of a statute supports a FDUTPA claim.  *Id.* (relying on the fact that state statute had never served as the predicate for a FDUTPA claim in ruling that there was no FDUTPA violation).

In addition, when a plaintiff bases a FDUTPA claim on the violation of any law, rule, regulation, or other allegedly false representation, whether *per se* or non-*per se*, the complaint must allege facts that concretely explain that an actual violation or misrepresentation has occurred.  For example, in *Koski v. Carrier Corp.*, a putative class plaintiff alleged that HVAC equipment included safety certifications that falsely stated that they complied with safety standards set forth in certain nationally recognized safety standards.  347 F. Supp. 3d 1185, 1193-94 (S.D. Fla. 2017).  Although the plaintiff did not attach the safety standards to the complaint, the court deemed them to be incorporated by reference and found that the complaint only referenced an incomplete portion of the standards.  *Id.* at 1194.  When this Court reviewed

the complete safety standards, it was clear that plaintiff had failed to allege facts supporting any violation. *Id*.

In doing so, this Court held that: "In order to state a claim under FDUTPA, a Plaintiff must allege: (1) a deceptive or unfair practice; (2) causation; and (3) actual damages." *Id*. (citations omitted). "The Florida Supreme Court has noted that deception occurs if there is a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Zlotnick*, 480 F. 3d at 1284. Again, every element must be alleged and proven. *City First Mortg.*, 988 So. 2d at 86. Here, of course, no "deceptive" act, nor any resulting damage, is alleged.

Plaintiff has also failed to allege any facts supporting a violation of §§ 562.455 or 500.004(1)-(3). The Amended Complaint merely references the predicate statute and notes that the product at issue has "Grains of Paradise" etched on the bottle. Evidently, despite these sparse allegations, Plaintiff wants this Court to ignore that not only does the Amended Complaint fail to allege that the product actually contains any amount of Grains of Paradise that may be harmful, it also fails to allege that the product is poisonous or harmful as a result, much less that it caused Plaintiff any actual harm. The Amended Complaint thus fails to state a claim under FDUTPA.

**6. Plaintiff Fails To Adequately Allege Damages Under FDUTPA**

Plaintiff's FDUTPA claim also fails because he does not allege actual damages. "The members of [a] putative class who experienced no actual loss have no claim for damages under FDUTPA." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 873 (Fla. 2d DCA 2006). There must be allegations and proof that the defendant committed deceptive acts and that those acts caused an actual injury. *Id* at 872-73. Further, if a party accepts and retains a benefit, they cannot later claim damages under FDUTPA, which makes it impossible to state a claim, given that "damages" is the third pleading requirement. *Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 824-25 (Fla. 4th DCA 2010). Here, Plaintiff's allegations concerning damages are vague and defective as a matter of law. Plaintiff's allegations concerning damages state that: (1) "Plaintiff and other Proposed Class Members have been damaged"; and (2) BUSA and Winn-Dixie "received and continues to hold monies belonging to Plaintiff"; and that the product is

adulterated and therefore "worthless."[8] (Am. Compl. ¶¶ 25, 40, 45, 47, 52 and 54).  There are no allegations that the Plaintiff was injured by consuming the product, and he only generally and without specificity states that "Plaintiff and other Proposed class members purchased and consumed the Adulterated Liquor in Florida."  *Id.* ¶ 25.  These allegations are conclusory and insufficient to state a claim.

Defective allegations concerning damages typically result in a lack of jurisdiction given that jurisdictional standing requires an injury-in-fact.  *DeBernardis*, 2018 WL 1536608, at *3 (dismissing FDUTPA claim because of defective damages allegation, and citing other similar cases).  In *DeBernardis*, plaintiffs alleged that the sale of a nutritional supplement was unfair and defective because it contained an ingredient known as DMBA, and thus the product was worthless (as opposed to having paid an unwarranted premium for the product).  *Id.* at *1-2.  The court determined that a variety of attempts to allege damages were conclusory and insufficient, including claims that: (1) the products contained the ingredient at issue and were thus "adulterated"; (2) the products were unsafe for human consumption and could not be lawfully sold to consumers"; (3) the products' labels were false, misleading and misbranded; and (4) misbranded products have no economic value.  *Id.* at *3 (noting that although plaintiffs alleged that they purchased the product, they never alleged they were harmed).[9]

However, the plaintiffs in *DeBernardis* did not allege that the products "failed to perform as advertised or caused adverse health effects," or that "particular representations caused them to pay more for the Supplements than they would have paid for a comparable product."  *Id.* In light of these defective allegations concerning damages, the court dismissed the complaint. *Id.* (citing *Hubert v. Gen. Nutrition Corp.*, No. 2:15-cv-01391, 2017 WL 3971912, at *3 (W.D. Pa. Sept. 8, 2017) (finding that FDUTPA claims, where adulteration of supplement was alleged, failed to allege adverse health consequences and required dismissal)).  *DeBernardis* is very

---

[8]    Notably, whether Plaintiff was damaged, or what the purported injury might be to a consumer who purchases and enjoyably consumes a product that prominently displays Grains of Paradise on the bottle, is not among the Amended Complaint's allegations.  (Am. Compl. ¶ 30).

[9]    Where no manifestation of harm is alleged, there can be no cognizable claim.  *In Re Toyota Motor Corp. Hybrid Brake Marketing Sales Practices and Products Liability Litigation*, 915 F. Supp. 2d 1151 (C.D. Ca. 2013).  Courts do not permit consumers to bring claims against manufacturers for products that may be perceived harmful, but have not actually caused any identifiable injury.  *O'Neill v. Simplicity Inc.* 553 F. Supp. 2d 1110 (D. Minn. 2008).

similar to this case where Plaintiff makes conclusory allegations that the product is adulterated and thus worthless.

Moreover, with respect to the measure of damages recognized under Florida law, FDUTPA only provides for "recovery of 'actual damages,' which cannot include consequential or special damages," or nominal damages, speculative losses or compensation for subjective feelings of disappointment. *City First Mortg. Corp.*, 988 So. 2d at 86; *Rollins, Inc.*, 951 So. 2d at 873. Under FDUTPA, actual damages are measured by the "difference in market value of the product . . . in the condition in which it was delivered and its market value in the condition in which it should have been delivered." *Reilly v. Chipotle*, 711 F. App'x 525, 529 (11th Cir. 2017); *see also DeBernardis*, 2018 WL 1536608, at *3 (rejecting allegations that the product was worthless as opposed to having paid an unwarranted premium for the product). Here, Plaintiff merely makes the conclusory allegation that the product is "worthless," not that he paid an unwarranted premium for the product. (Am. Compl. ¶¶ 47-52). Therefore, this damages allegation is defective as a matter of law.

In short, the Plaintiff does not allege the product did not perform as expected, or that it had any adverse effects related to Grains of Paradise. Further, all the damages allegations are entirely conclusory. Nor does the Amended Complaint allege any damages theory that is recognized as a remedy under Florida law that can be awarded under FDUTPA because allegations of "worthlessness" are deficient as a matter of law. Therefore, Plaintiff fails to allege damages under FDUTPA.

### 7.   Plaintiff Fails To Adequately Allege Causation Under FDUTPA

In the absence of allegations supporting a deceptive or unfair trade practice or damages, Plaintiff cannot plead causation. Plaintiff has failed to identify any statute that could serve as a *per se* FDUTPA violation, and has failed to allege any facts showing how the etching of Grains of Paradise on the bottle is deceptive or unfair. In addition, absent any deceptive or unfair practice actually causing an injury, there can be no causation. *Kais v. Mansiana Ocean Residences, LLC*, No. 08-21492-CIV, 2009 WL 825763, at *2 (S.D. Fla. Mar. 26, 2009) (dismissing FDUTPA claim for lack of causation); *see also Flexiteek Americas, Inc. v. Plasteak, Inc.*, No. 12-60215, 2013 WL 6233175, at *5 (S.D. Fla. Dec. 2, 2013) (holding that causation under FDUTPA must be direct and cannot be proven by inference alone); *Owens v. Gen. Motors Corp.*, 533 F.3d 913, 922 (8th Cir. 2008) ("There must be a causal connection between the

ascertainable loss and the deceptive practice."); *Mikhlin v. Johnson & Johnson*, No. 4:14-CV-881, 2014 WL 6084004, at *1 (E.D. Mo. Nov. 3, 2014) (finding that allegations of a contaminated product with no claims of actual injury could not state a claim); *In Re Avandia Mktg. Sales Practices and Prod. Liab. Litig.*, 100 F. Supp. 3d 441, 445-46 (E.D. Pa. 2015) (purchasing alleged harmful product not actionable under consumer protection statutes unless there is a causally related injury and dismissing with prejudice on similar grounds).

Plaintiff's claim, although vaguely worded, implies that Bombay Sapphire Gin is adulterated, although there are no allegations that the product is poisonous, deleterious, or otherwise harmful.  More importantly, Plaintiff alleges no deceptive act by either Defendant that led him to purchase the product.  Thus, there can be no causation where Plaintiff was not misled into purchasing the product, Plaintiff consumed the product, Plaintiff presumably enjoyed the product, and Plaintiff did not assert any allegations that he was ever injured by doing so.  Further, Plaintiff brings no strict liability claims (nor could he).  Nevertheless, it is hornbook law that when a product causes no injury to the individual, tort liability is precluded.  *Aprigliano v. Am. Honda Motor Corp.*, 979 F. Supp. 2d 1331, 1336-37 (S. D. Fla 2013); *see also Bertovich v. Advanced Brands*, No. 5:05-CV-74, 2006 WL 2382273 (N.D. W. Va. Aug. 14, 2006); *Alston v. Advanced Brands*, 494 F.3d 562 (6th Cir. 2007).  Even under consumer statutes, the claim requires a representation that the goods have characteristics, ingredients or uses which they do not have. In the absence of identifying any statement of Winn-Dixie or BUSA that misrepresents the product, no claims can be had.  *Tae Hee Lee v. Toyota Motor Sales*, 992 F. Supp. 2d 962, 971-74 (C. D. Calif. 2014).  Even a tort theory requires the plaintiff to establish both that the alleged wrongful conduct of the defendant has actually caused the plaintiff harm and that the causal connection was the proximate cause of a direct injury causing harm.  *The Republic of Venezuela v. Phillip Morris Cos. Inc.*, 827 So. 2d 339, 341 (Fla. 3d DCA 2002); *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 848 (6th Cir. 2003).  Thus, causation is lacking.

## B.  PLAINTIFF ALSO FAILS TO STATE A CLAIM FOR DECLARATORY OR INJUNCTIVE RELIEF UNDER FDUTPA

In addition to its other FDUTPA claims, Plaintiff adds an additional Count IV, attempting to obtain a declaratory judgment and injunction against Defendants; yet this Count fails for many of the same reasons as the preceding FDUTPA claims.  Under § 501.211(1), Florida Statutes, "anyone aggrieved by a violation of this part [FDUTPA] may bring an action to obtain a

declaratory judgment that an act of practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part." Fla. Stat. § 501.211(1). "To obtain a declaratory judgment or injunction, [a plaintiff] must show that it is 'aggrieved by a violation' of FDUTPA." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019). "[I]n order for the consumer to be entitled to any relief under FDUTPA, the consumer must not only plead and prove that the conduct complained of was unfair and deceptive, but the consumer must also plead and prove that he or she was aggrieved by the unfair and deceptive act." *Macias v. HBC of Florida, Inc.*, 694 So. 2d 88, 90 (Fla. 3d DCA 1997). "Further, 'for someone to be aggrieved, the injury claimed to have been suffered cannot be merely speculative.'" *Stewart Agency, Inc.*, 266 So. 3d, at 214. A failure to state a claim occurs where a plaintiff "has not adequately asserted facts showing consumer injury or detriment." *Sandshaker Lounge & Package Store LLC v. RKR Beverage Inc*, 317-CV-00686, 2018 WL 7351689, at *6 (N.D. Fla. Sept. 27, 2018) (holding that plaintiff did not state a claim because none of the allegations in its count for equitable relief "plausibly suggest that [d]efendants' action led to consumer harm").

Here, Plaintiff does not allege any specific allegations that he was aggrieved. He simply states that "Plaintiff and members of the proposed class are aggrieved consumers of Florida as result of Defendants knowing and flagrant violation of Florida law and sale of an illegal product to them." Am. Compl. ¶ 57. Yet Plaintiff does not allege any facts about how he was aggrieved. Further, there are no allegations of deception by the Defendants—again, Grains of Paradise is etched on the bottle. When "[t]aking the allegations in the complaint in light most favorable" to the Plaintiff, if the Court "cannot come up with any theory upon which they are actually injured or aggrieved by the allegedly misleading advertisement," (here, Plaintiff does not allege any misleading advertising) the Court must find the equitable count fails. *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1335–36 (S.D. Fla. 2007). If a plaintiff "cannot claim to have suffered any damage from the allegedly misleading statements," then the claim fails. *Id.* Here, not only can Plaintiff not point to any allegedly misleading statements whatsoever, but in addition, he cannot identify any damage or injury whatsoever. As a result, Count IV fails and must be dismissed.

In the Amended Complaint, Plaintiff requests that the Court "enjoin" Defendants from "violating Florida law" on behalf of Plaintiff and "all others similarly situated." Am. Compl. at p. 15. If the Court were to enjoin Defendants on this basis, such an injunction would purportedly

prohibit the sale of the product to every Florida resident, but would still allow any tourist or non-Florida resident to buy the product in Florida.[10]

Further complicating the enforcement of any injunction or declaratory relief, only BUSA and Winn-Dixie would be covered by the relief, which poses several problems as well. First, BUSA only sells to distributors, not to retailers or the public, and interrupting this chain of commerce[11] would lead to confusion among distributors and would affect their business as well. Secondly, Winn-Dixie could then sell Bombay Sapphire Gin to anyone other than a Florida citizen, but it would be impossible for Winn-Dixie to know who is who. Lastly, no other retailer, liquor store, bar, restaurant, or other location selling liquor or liquor-based drinks would be limited by the declaratory relief, so those entities could sell the product to whoever they want. Plaintiff's request for relief is accordingly inherently defective because it would be impossible to grant, impossible to administer, and impossible to enforce.

## C.  PLAINTIFF FAILS TO ADEQUATELY ALLEGE UNJUST ENRICHMENT

Plaintiff fails to state a claim for unjust enrichment.[12] The Amended Complaint alleges that the "Plaintiff and the members of the class have conferred direct benefits to the Defendants by purchasing Bombay Sapphire ® gin from Defendants at WINN-DIXIE." Am. Compl. ¶ 66. But Plaintiff does not allege a particular Winn-Dixie with ascertainability. Plaintiff does not allege that he purchased the product from BUSA, either. He also does not properly allege how

---

[10]    If Plaintiff is instead intending to seek this declaratory relief for others outside of the class, Plaintiff's attempt to limit the class to Florida residents fails. Despite a plaintiff limiting a class, courts often analyze if there are other real parties in interest that the plaintiff's relief seeks to include, thereby expanding the class. *See, e.g.*, *Zinn, et al. v. SCI Funeral Services of Florida, Inc., et al.*, No.: 9:12-cv-80788-KLR (S.D. Fla. 2012) (finding that the injunctive relief sought in plaintiffs' action sought relief for the benefit of the public at large).

[11]    Moreover, the Court should not grant an injunction that violates the Commerce Clause, but Plaintiff is seemingly asking the Court to do so. A declaratory judgment and injunction that would treat Florida citizens and non-citizens differently, which would be impossible to administer and police, and would likely violate the Commerce Clause of the United States Constitution. *See Edgar v. MITE Corp.*, 457 U.S. 624, 642 (1982) (striking down state law requiring state approval of nationwide tender offers because interstate commerce would be "thoroughly stifled").

[12]    Paragraph 69 of the Amended Complaint states: "As a direct and proximate result of the aforementioned acts by the Defendants, Defendants have been unjustly enriched and Plaintiff and the members of the class who were induced into purchasing Bombay Sapphire gin ® and [*sic*] are entitled to a return of the value of the benefit conferred upon Defendants as alleged herein." Am. Compl. ¶ 69.

the product is adulterated with Grains of Paradise.[13]  Plaintiff's only explanation for how the Defendants were unjustly enriched is that "Plaintiff did not receive what it bargained for: to wit a product which did not violate Sec. 562.455, Fla. Stat. and/or 500.04(1)-(3)."  *Id.* ¶ 67.   Yet Plaintiff does not explain that he bargained for that.  Plaintiff and the class members purchased Bombay Sapphire Gin and they received that same gin.

Plaintiff's unjust enrichment claim also fails because it seeks the same relief as his FDUTPA claim.  "Under Florida law, damages under the common law claim for breach of contract implied in law, also known as quasi-contract or quantum meruit, are awarded on a theory of unjust enrichment.  *Am. Honda Motor. Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1178-79 (M.D. Fla. 2005).  "It is well settled in Florida that unjust enrichment is an equitable remedy and is, therefore, not available when there is an adequate legal remedy.  *Id.*  "Thus, to properly state a claim for unjust enrichment, a party must allege that no adequate legal remedy exists."  *Id.*  Because the plaintiff had an adequate remedy under FDUTPA, unjust enrichment cannot proceed.  *Id* at 1179.  Therefore, an unjust enrichment claim is defective when it seeks the same relief as a FDUTPA claim because FDUTPA is a legal remedy.  Here, a cursory review of Count V (unjust enrichment) shows that it is the same as Counts I-III.

Under Florida law, the elements of an unjust enrichment claim are: (i) the plaintiff has conferred a direct benefit on the defendant, who has knowledge thereof; (ii) the defendant voluntarily accepts and retains the benefit conferred; and (iii) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff.  *West Coast Life Ins. Co. v. Life Brokerage Partners LLC*, No. 08-80897, 2009 WL 2957749, at *11 (S.D. Fla. Sept. 9, 2009); *see also Koski v. Carrier Corp.*, 347 F. Supp. 3d 1195-96.

---

[13]        Throughout the Amended Complaint Plaintiff "lumps" the Defendants together.  "A party should plead each distinct claim in a separate count, rather than plead the various claims against all of the defendants together."  *K.R. Exch. Servs., Inc. v. Fuuerst, Humphrey, Ittleman, PL*, 48 So. 3d 889, 893 (Fla. 3d DCA 2010) (affirming dismissal of complaint for improperly lumping together allegations supporting various claims against various defendants); *see also Pratus v. City of Naples*, 807 So. 2d 795, 797 (Fla. 2d DCA 2002) (affirming dismissal and holding that, where complaint asserts causes of action against different defendants, "each claim should be pleaded in a separate count instead of lumping all defendants together").  A plaintiff cannot rely on general allegations which "lump" all of the defendants together.  *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997); *see also Burnette v. Dresser Indus., Inc.*, 849 F.2d 1277, 1283 (10th Cir. 1988); *DiSisto College, Inc. v. Line*, 888 F.2d 755, 764 (11th Cir. 1989).

First, it is well-settled that, unless a plaintiff confers a *direct* benefit on the defendant, then a Florida unjust enrichment claim fails. *West Coast Life Ins. Co.*, 2009 WL 2957749, at *11 (explaining that a "direct" benefit is required and citing *Huntsman Packaging Corp. v. Kerry Packaging Corp.*, 992 F. Supp. 1439 (M.D. Fla. 1998)). Second, the Plaintiff failed to plead *any* factual predicate to support the indispensable element that the Defendants "knowingly or voluntarily" accepted or retained any benefit that was directly conferred. *See Al-Babtain v. Banoub*, No. 8:06-cv-1973-T-30TGW, 2008 WL 4938348, at * 4 (M.D. Fla. Nov. 18, 2008). Plaintiff only pled that "Defendants appreciated that benefit conferred on it by Plaintiff and members of the claim by virtue of its retention of the money paid for the Bombay Sapphire ® gin." Am. Compl. ¶ 66. This statement is as riddled with inconsistencies as it is unclear regarding what the benefit actually was. Plaintiff states that both Defendants, plural, appreciated the benefit, but then continue to use the possessive pronoun "its" referring to only one Defendant. It is unclear which Defendant Plaintiff is referring to. And it is unclear which Defendant received the "money paid" and how. Plaintiff has not established that he conferred a direct benefit on either Defendant, nor has he established that either (or both) Defendants knowingly or voluntarily accepted that benefit.

Further, under §§ 561.14561.42, Florida Statutes, Florida abides by the three tier liquor distribution system (supplier, distributor and retailer). BUSA cannot hold an interest in a retailer or sell directly to a retailer or consumer. Therefore, BUSA cannot receive a direct benefit from any consumer. *Feheley,* 2009 WL 2474061 at *5. Likewise, Plaintiff has not pled a direct benefit to Winn-Dixie because he has not pled sufficient allegations that he purchased the product at a particular Winn-Dixie or provided proof of purchase. The threshold issue of "ascertainability" relates to whether an identifiable class exists and "if its members can be ascertained by reference to objective criteria.'" *Bussey v. Macon Cty. Greyhound Park, Inc.,* 562 F. App'x 782, 787 (11th Cir. 2004).[14] Yet, there is no proof of purchase or ascertainabilty referred to in the Amended Complaint.

Further, to the extent that Plaintiff consumed the Bombay Sapphire Gin, he can have no unjust enrichment claim. As the law clearly states, the acceptance of a product or service negates

---

[14]     As the Eleventh Circuit explained in *Karhu v. Vital Pharms., Inc.*: "Rule 23 implicitly requires that the 'proposed class is adequately defined and clearly ascertainable.'" 621 F. App'x 945, 946, 948-50 (11th Cir. 2015).

17

one's ability to later claim unjust enrichment of the party providing the product or services. *Dorestin*, 45 So. 3d at 824-25; *N.G.L. Travel Associates v. Celebrity Cruises Inc.*, 764 So. 2d 672 (Fla. 3d DCA 2000); *Gene B. Glick Co. v. Sunshine Ready Concrete Co.*, 651 So. 2d 190 (Fla. 4th DCA 1995); *The Real Estate Value Company Inc. v. Carnival Corporation*, 92 So. 3d 255, 263 (Fla. 3d DCA 2012).   Moreover, Plaintiff's failure to plead any unfair or deceptive acts eliminates any claim that Plaintiff retained benefits under inequitable circumstances.  *Feheley*, 2009 WL 2474061, at *6.  Therefore, Plaintiff's unjust enrichment claim fails.

### D.  PREEMPTION AND RELATED ISSUES

#### 1.  Background

##### a.  The Food Additives Amendment of 1958

The United States Congress has vested the Food and Drug Administration (FDA) with the authority to regulate the safety of ingredients used in foods and beverages, including Grains of Paradise used in making distilled spirits.  Through the Food Additives Amendment of 1958, Congress amended the Federal Food, Drug, and Cosmetic Act (FFDCA), 21 U.S.C. §§ 301 *et seq.,* to grant FDA broad regulatory authority to monitor and control the introduction of "food additives" into interstate commerce.  The term "food" is defined broadly as including "articles used for food or drink," which includes conventional foods, as well as alcoholic beverages.[15] The goal of the Amendment as defined by Congress is two-fold—first, "to protect the health of consumers by requiring manufacturers of food additives and food processors to pretest any potentially unsafe substances which are to be added to food; and second, to advance food technology by permitting the use of food additives at safe levels."[16]

Congress also excluded substances that are "generally recognized as safe" or "GRAS" from the "food additive" definition.  By statute, the definition of "food additives" excludes

---

[15]    21 U.S.C. § 321(f); *see, e.g.,* Memorandum of Understanding Between The Food and Drug Administration and The Bureau of Alcohol, Tobacco and Firearms; Nov. 20, 1987, https://www.fda.gov/about-fda/domestic-mous/mou-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 (confirming that FDA has authority over adulteration of alcohol beverages); FDA Guidance for Industry: Labeling of Certain Beers Subject to the Labeling Jurisdiction of the Food and Drug Administration (Dec. 2014), https://www.fda.gov/media/90473/download ("The definition of "food" under the FD&C Act includes "articles used for food or drink" and thus include alcoholic beverages. See 21 U.S.C. 321(f). As such, alcoholic beverages are subject to the FD&C Act's adulteration and misbranding provisions, and implementing regulations, related to food.").

[16]    Cong. Rec. 17413 (daily ed. Aug. 13, 1958) *reprinted in Legislative History of the Federal Food, Drug, and Cosmetic Act and Its Amendments*, vol. XIV at 865.

substances that are "generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under the conditions of its intended use."[17]  The FDA's regulations provide that in order for a substance to be GRAS, there must be evidence that the substance is safe under the conditions of its intended use.[18]  As explained below, the agency has concluded under the rigorous GRAS process that Grains of Paradise is "generally recognized as safe," and, therefore, is contained on the FDA's GRAS list with other likewise safe substances.

Congress also granted the FDA authority to ban food additives or to otherwise take action against unsafe products, should such action be necessary.  The FDA's regulations dictate that ingredients "which have been considered in the past by the Food and Drug Administration to be safe under the provisions of section 402(a)(1)[of the FFDCA], or to be generally recognized as safe for their intended use, or to have prior approval, or not to be food additives under the conditions of intended use, must be reexamined in the light of current scientific information and current principles for evaluating the safety of food additives if their use is to be continued."[19]  Thus, a mechanism exits to challenge any food designated as "safe" by the FDA.

The FDA, therefore, continues to have gatekeeping authority for ingredients like Grains of Paradise that the agency has historically considered GRAS.  Indeed, in 2015, the agency issued a determination stating that there is no longer consensus among experts that partially hydrogenated oils (PHOs), the primary source of artificial trans fats and an ingredient considered GRAS based on common use, are GRAS.[20]  The agency therefore issued a declaratory order revoking the GRAS status of that ingredient.  Similarly, in 2018 FDA revoked its previous

---

[17]     FFDCA § 201(s); 21 U.S.C. § 321(s); *see also* 21 C.F.R. § 170.30(a).

[18]     The FDA has defined "safe" as establishing a reasonable certainty in the minds of competent scientists that the substance is not harmful under its intended conditions of use.  The standard for safety is substantial, reflecting the Congressional judgment that the FDA ensure a safe food supply. 21 C.F.R. § 170.3(i).

[19]     21 C.F.R. § 170.6(c).

[20]     80 Fed. Reg. 34650 (June 17, 2015).

authorization for seven synthetic flavorings and adjuvants as food additives based on animal data showing carcinogenicity.[21]

### b.   FDA Regulatory History for Grains of Paradise

Grains of Paradise is considered GRAS, and is expressly listed as GRAS in FDA regulations.[22]   It is recognized as GRAS under the category "spices and other natural seasonings and flavorings" with no limitations on the use level.   This means that Grains of Paradise may be used as a spice, seasoning, or flavoring, at any level and in any food or beverage, consistent with good manufacturing practice, *i.e.*, consistent with the level needed for its technical or functional effect in flavoring or seasoning the product.   The GRAS regulation was originally adopted in 1960, shortly after the passage of the Food Additives Amendment of 1958.[23]   The FDA issued a proposed rule listing Grains of Paradise as GRAS in 1959 and the final rule in 1960.[24]   The statutory/regulatory scheme provided an opportunity for anyone to this classification; the proposal to list Grains of Paradise as GRAS was finalized without change.

In addition to the FDA regulation, the Flavoring and Extract Manufacturers Association (FEMA) has included Grains of Paradise on its list of GRAS flavoring substances since the early 1960s.[25]   The FEMA GRAS program began in 1959 with a survey of the flavor industry to identify flavor ingredients then in use and to provide estimates for the amounts of these substances used to manufacture flavors.   Following that initial survey, the program has assessed the GRAS status of flavoring ingredients using an expert panel consisting of six to eight members with expertise in toxicology, organic chemistry, biochemistry, metabolism, and pathology. The FEMA GRAS program has become the longest-running and most widely recognized industry GRAS assessment program.

---

[21]      83 Fed. Reg. 50490-50503 (Oct. 8, 2018).

[22]      21 C.F.R. § 182.10.

[23]      21 C.F.R. § 121.101(e)(1); *recodified* in 1977 as §182.10. 42 Fed. Reg. 14304, 14640 (Mar. 15, 1977).

[24]      25 Fed. Reg. 404 (Jan. 19, 1960) (final rule); 24 Fed. Reg. 3055 (Apr. 21, 1959) (proposed rule).

[25]      *See* FEMA GRAS Flavor Library, Grains of Paradise, https://www.femaflavor.org/flavor-library/grains-paradise-aframomum-melegueta-rosc-k-schum (last visited Oct. 22, 2019).

### c. Florida Grains of Paradise Adulteration Provision

An antiquated Florida law states:

> **562.455 Adulterating liquor; penalty.**—Whoever adulterates, for the purpose of sale, any liquor, used or intended for drink, with … grains of paradise,… or any other substance which is poisonous or injurious to health, and whoever knowingly sells any liquor so adulterated, shall be guilty of a felony of the third degree, punishable ads provided in s. 755.082, s. 755.083, or s. 755.084.[26]

The term "adulterates" is not defined in this statute. The statute provides no basis for considering Grains of Paradise "poisonous or injurious to health," and, in fact, the federal government holds to the contrary.  The generally accepted definition of an adulterated substance is taken from 21 U.S.C. § 342: "A food shall be deemed to be adulterated: If it bears or contains any poisonous or deleterious substance which may render it injurious to health."  The Plaintiff has not alleged, nor does the statute provide, a basis for Grains of Paradise being considered a poisonous or deleterious substance.

### 2. <u>Federal Preemption</u>

The Florida statute that prohibits adulterating a liquor product with Grains of Paradise is preempted by the FFDCA and the FDA GRAS regulation recognizing this ingredient is safe for use in foods and beverages because "state laws are preempted when they conflict with federal law."[27]  Conflict preemption exists (1) where "compliance with both federal and state regulations is a physical impossibility," or (2) where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[28]  Section 562.455 of the Florida Statutes is preempted because it is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," specifically, the 1958 Food Additives Amendment and its implementing regulations, which establish that grains of paradise is GRAS and safe for intended purposes.[29]  FDA regulations provide preemption and foreclose the dispute.  *Lombardo*, 124 F. Supp. 3d at 1287-88.

---

[26]     Fla. Stat. Ann. § 562.455.

[27]     *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012).

[28]     *Id.*  (internal quotation marks and citations omitted).

[29]     21 U.S.C. § 321; 21 C.F.R. § 182.10.

### a. Conflict Preemption

Since the Supreme Court's decision in the seminal case of *McCulloch v. Maryland*, it has been settled that state law that conflicts with federal law is "without effect."[30] This priority extends to federal statutes, as well as to regulations promulgated pursuant to those statutes, such as FDA's GRAS regulations.[31]  The "obstacle prong" of conflict preemption bars the application of state law where, as here, overriding federal concerns are found.[32] When determining whether a state law conflicts with a federal law, courts examine the "federal statute as a whole and identify[] its purpose and intended effects."[33]  Courts also consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written.[34]  The FFDCA and its implementing regulations, as interpreted and applied, preempt the Florida law on grains of paradise.

The Food Additives Amendment was enacted to provide manufacturers and consumers with uniform assurances about the safety of ingredients. Congress intended to establish a national-level repository of safety findings on which consumers and manufacturers alike could rely.  A review of the legislative history of the Amendment reveals that a primary purpose of the Amendment was to ensure a uniform food additive policy that does not hinder advances in food technology.  According to a legislative report accompanying the bill at the time of its passage, the Amendment seeks to prevent rules that unnecessarily prohibit access to safe food additives.[35] The report goes on to say that the Amendment:

> would make possible the use of additives discovered by our scientists which, having been adjudged safe for humans and animals when used in or within certain

---

[30]     17 U.S. (4 Wheat.) 316 (1819); *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981).

[31]     *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982).

[32]     *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 874 (2000).

[33]     *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013) (internal quotation marks omitted), *cert. denied sub nom. Exxon Mobil Corp. v. City of New York,* 134 S. Ct. 1877 (2014).

[34]     *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1976) (finding a State statute may be preempted on obstruction grounds when "the enforcement . . . as implemented. . . would prevent the accomplishment and execution of the full purposes and objectives of Congress") (internal quotations and citation omitted).

[35]     S. Rep. No. 2422, at 2 (1958) (stating the Amendment seeks to prevent rules that "unnecessarily proscribe the use of additives that could enable the housewife to safely keep food longer, the processor to make it more tasteful and appetizing, and the Nation to make use of advances in technology calculated to increase and improve our food supplies").

quantitative limits, could materially advance our ability to make more wholesome foods available to more people at all seasons and, perhaps, we hope, to assure to ourselves and others the ability to stockpile supplies of healthful and appetizing foods over such long periods of time as emergencies might make either desirable or essential.[36]

With respect to GRAS substances specifically, the creation of the GRAS provision reflects Congress's determination that many substances added to food can be considered safe by both the consumer and the manufacturer.

A prohibition on the use of Grains of Paradise in liquor is in clear conflict with federal law and obstructs Congress's objective by preventing alcoholic beverage manufacturers from using and consumers from enjoying an ingredient long-recognized under federal law as safe and permitted for use in every other type of food or beverage in Florida.  Such a ban would frustrate the congressional purpose behind the Food Additives Amendment to the FFDCA.  Grains of Paradise has been reviewed and recognized as GRAS according to Congress' express statutory command, as set forth in the Amendment.  Moreover, the federal scheme permits challenges to any GRAS determination, so as to mandate uniform acceptance of safe substances.  In *Prohias v. Astrazenca Pharmaceuticals*, the appellate court found that to the extent that actual preemption did not bar a FDUTPA claims, "[p]laintiff's state law claims would conflict with federal law and the FDA-approved Nexium labeling and therefore are preempted."  958 So. 2d at 1054.

The application of a state law prohibiting certain uses of Grains of Paradise would fly in the face of the FDA regulatory determination that Grains of Paradise is safe to use as a spice, seasoning, or flavoring without any restrictions or conditions on its use.  To apply this state statute would undermine the federal regulatory structure and set the precedent that each state can ignore FDA's extensive analysis of food substances and develop its own food additive regulations—precisely the opposite of what Congress envisioned when it established a national food additive regulatory scheme.  If states were allowed to ban a food ingredient at their discretion regardless of its federal legal status, the result would be an absurd patchwork of inconsistent state laws, causing some ingredients to be banned in some states and legal in others, despite having been deemed safe for consumption by FDA.  This result would be particularly absurd when the state law in question was enacted decades before the subsequent FDA determination that Grains of Paradise is GRAS and therefore does not reflect the significant

---

[36]        *Id.* at 3.

history of use and safety data available to the FDA at the time the agency reached its determination.  A fragmented, non-uniform approach to ingredient safety would be in open conflict with the federal framework envisioned by Congress and implemented by FDA for 60 years.[37]  For these reasons, enforcement of the State statute prohibiting Grains of Paradise in liquor is preempted.

### 1)   Florida Law Establishes a Preference for Consistency with Federal Law Pertaining to the Safety of GRAS Ingredients

Applying conflict preemption in this instance is consistent with Florida legislative intent. The Florida legislature has expressed a preference for consistency with the FFDCA, especially as it pertains to GRAS ingredients.  In Florida, safety of ingredients in foods is regulated under the Florida Food Safety Act by the Florida Department of Agriculture and Consumer Services (the Department).[38]  The Florida Food Safety Act establishes a preference for consistency with the FFDCA, stating that the Act is intended to be administered "so far as practicable in conformity with the provisions of, and regulations issued under the authority of, the Federal Food, Drug, and Cosmetic Act" and to "promote thereby uniformity of such state and federal laws."[39]

The Department is authorized to adopt rules for enforcement of the Food Safety Act but any "rules must be consistent with those adopted under the federal act in regard to food and, to this end, the department may adopt by reference those rules."[40]  Because Grains of Paradise has been deemed safe in GRAS, it is not a "food additive."  Like federal law, the Florida Food Safety Act exempts GRAS substances from the definition of "food additive."[41]  As discussed further above, Florida regulations have specifically incorporated and adopted by reference the FDA regulations pertaining to GRAS status, including 21 C.F.R. § 182.10, which states that Grains of

---

[37]      *See Rath Packing*, 430 U.S. at 542-43 (holding that unique-to-California net-weight labeling rule stood as obstacle to Congress's purpose in enacting uniform packing and labeling requirements); *Freeman v. Burlington Broadcasters, Inc.*, 204 F.3d 311, 325 (2d Cir. 2000) (invalidating local zoning restrictions on radio broadcasts because posed an obstacle to Congress's purpose in "delegating regulatory power to the FCC for uniform regulation of broadcast technologies").

[38]      Fla. Stat. tit. XXXIII, ch. 500.

[39]      *Id.* § 500.02.

[40]      *Id.* § 500.09(3).

[41]      *Id.* § 500.03(o).

Paradise are GRAS.[42] Therefore, the statutory preference for consistency with federal law applies.[43]

As a policy matter, therefore, the application of federal preemption in this instance, involving the safety of a substance recognized as GRAS under federal law and under Florida law, is consistent with Florida's Food Safety Act and its underlying goals.  It also is consistent with the current views of the Florida regulatory agency charged with overseeing ingredient safety, which has adopted the FDA GRAS regulation on Grains of Paradise.  In fact, the statute Plaintiff advances is inconsistent with the Florida regulatory scheme for determining the safety of ingredients in products.

Moreover, statutes and regulations passed subsequent to an older statute and that conflict with more recent pronouncements are repealed by implication and found to be void.  Here, the Florida statutes and regulations adopt the FDA GRAS list of safe ingredients, including Grains of Paradise, and are in direct conflict with the ancient Florida statute on adulteration; thus repealing it by implication and making it void as to Grains of Paradise.  *Oldham v. Rooks*, 361 So. 2d 140 (Fla. 1978); *Atkins v. Bethea*, 160 Fla. 99 (Fla. 1948).[44]

**b.  <u>Primary Jurisdiction</u>**

This Court should also dismiss this case on primary jurisdiction grounds in recognition of the highly technical issues related to the safety of an ingredient that are best left to the FDA to assess.  The primary jurisdiction doctrine applies "whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body."[45]  The doctrine "allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency."[46]

---

[42]    Fla. Admin. Code R. 5K-4.002(d).

[43]    *Id.* §§ 500.02; 500.09(3).

[44]    Moreover, statutes must be construed to avoid absurdity.  *Rector etc. of the Holy Trinity Church v. U.S.* 143 U.S. 457, 460-61 (1892).  To construe the Florida statute on adulteration to mean that Grains of Paradise "automatically" causes adulteration would be absurd and fly in the face of FDA and Florida statues and regulations.

[45].    *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956).

[46]    *Jones v. ConAgra Foods, Inc.,* 912 F. Supp. 2d 889, 898 (N.D. Cal. 2012) (internal quotations omitted).

Under the doctrine, the following four factors are relevant to a court's determination of whether to defer to an agency's primary jurisdiction: "(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made."[47]  The question of the safety of Grains of Paradise as a flavoring in gin meets all four of these factors.

First, the safety of an ingredient for a particular intended use involves highly technical considerations – including evaluation of toxicology data, levels of use, history of use, and other factors – that fall squarely within the FDA's unique expertise.  Second, the question at issue is particularly within the agency's discretion because it relates to the safety status of an ingredient used in foods and beverages.  Congress has directed the FDA to regulate the safety of food ingredients, and the agency has discretion with respect to questions such as how to weigh specific scientific studies, characteristics of the substance, the estimated dietary intake, and other factors that are critical to assessing ingredient safety.  Third, the application of a Florida law pertaining to Grains of Paradise would present a significant danger of inconsistent rulings – specifically, it would allow the possibility of a state ruling inconsistent with the federal law (as well as its own food safety regulations) that recognizes the safety of this ingredient as a flavoring, with no restrictions on use level or the type of food or beverage in which it is used.

Finally, Plaintiff has not previously applied to either the FDA or to Florida regulators to ask that the agencies revoke the GRAS status of Grains of Paradise or otherwise take regulatory or enforcement action on its use.  If Plaintiff has a concern with the safety of Grains of Paradise, he should petition the FDA to review its GRAS status.  For instance, in 2009, Dr. Fred Kummerow petitioned the FDA to ban the use of partially hydrogenated oils in foods, ultimately resulting in the FDA issuing a final determination in 2015 revoking the GRAS status of this ingredient.[48]

The safety of Grains of Paradise in liquor – already clearly established under an FDA regulation – is settled.  In the event Plaintiff seeks a re-evaluation of the safety of this ingredient,

---

[47]     *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co*., 46 F.3d 220, 222 (2d Cir. 1995).

[48]     Citizen Petition to ban partially hydrogenated fat from the American Diet, FDA Docket No. 2009-P-0382; 80 Fed. Reg. 34650 (June 17, 2015).

he should apply directly to the agency with the technical expertise to appropriately evaluate the ingredient's use in liquor.  Therefore, the Court should also dismiss the case under the primary jurisdiction doctrine.

### E.  GRAINS OF PARADISE DOES NOT ADULTERATE LIQUOR WITHIN THE MEANING OF THE FLORIDA LAW

Grains of Paradise does not adulterate Bombay Sapphire Gin within the meaning of Florida law.  The Florida law on Grains of Paradise is not worded as an outright prohibition on the use of grains of paradise in liquor—rather, the law only makes it a prohibited act to "*adulterate*" liquor with Grains of Paradise or other substances that are "*poisonous or injurious to health*."  The use of Grains of Paradise as a flavor does not adulterate liquor.  Plaintiff makes no claim that Grains of Paradise is poisonous or injurious to health, nor is the ingredient "poisonous or injurious to health" when used for this purpose, as recognized by federal and Florida law in conferring GRAS status to Grains of Paradise.

The term "adulterates" is not defined under the Florida statute concerning adulterated liquor that Plaintiff cites.  Federal law does, however, define the term, and Florida courts have applied the FFDCA in interpreting the meaning of adulteration.[49]  Grains of Paradise does not "adulterate" food under the recognized definition.   Under the FFDCA, a food is deemed adulterated, as relevant here, if it "bears or contains any poisonous or deleterious substance which may render it injurious to health" or if it bears or contains an unsafe food additive.[50]  As discussed above, GRAS substances are exempt from the definition of "food additive," so Grains of Paradise is not an unsafe food additive.  Plaintiff has provided no evidence that Grains of Paradise presents a health or safety risk under its conditions of use in Bombay Sapphire Gin.  To the contrary, the FDA GRAS regulation establishes that there is no such health or safety risk.

Importantly, in order for a substance to be considered an adulterant in food under the "injurious to health" provision, the substance must render the food injurious to health under the conditions of its intended use.  The mere presence of a substance in food in food is not sufficient

---

[49]     *Burke Pest Control, Inc. v. Joseph Schlitz Brewing Co.*, 438 So. 2d 95 (1983) (concluding that in order for beer to be adulterated by the accidental addition of a pesticide, plaintiff had the burden of showing that the beer "contained a poisonous and deleterious substance which may render it injurious to health," based on the adulteration standard in the FFDCA) (citing *United States v. Anderson Seafoods, Inc.*, 622 F.2d 157 (5th Cir. 1980)).

[50]     FFDCA section 402(a)(1) and 2(C); 21 U.S.C. § 342(a)(1) and (2)(C).

to establish that it may render the food injurious to health.[51]   As part of determining whether an ingredient may render a food injurious to health, courts require consideration of "all of the circumstances" of the intended use, including the amount of the substance present in the food, and a showing that under such circumstances, the substance may render the food injurious to health.[52]   Here, of course, the bottle clearly indicates that Grains of Paradise is only present by infusion.   As stated on Bombay Sapphire Gin's web site: "Once we've hand-selected the finest botanicals on earth, there's no way we're then going to boil them. We gently vapor infuse them to capture their bright, vibrant flavours."   As the videos on the web site plainly show (and as the bottle states) the gin is heated to create a vapor which then passes through a "basket' of many aromatic botanicals including Grains of Paradise and extracts their aroma.   No actual Grains of Paradise is placed into the product.   *See* BOMBAY SAPPHIRE, https://www.bombaysapphire.com /us/en/products/bombay-sapphire/ (last visited Oct. 22, 2019).

Federal regulations recognize that Grains of Paradise is safe for its use as a spice, flavoring, or seasoning in any foods and beverages without any specific limitations on use.   The FDA's safety assessment confirms the ingredient is not a "poisonous or deleterious substance" that may render liquor injurious to health under the conditions of intended use.   Plaintiff has not provided any information or data to the contrary.   Nor has Plaintiff even provided information as to whether or not Grains of Paradise, as opposed to the aromatic flavoring from it, is contained in Bombay Sapphire Gin.

Moreover, as noted above, Florida has expressly adopted the FDA GRAS regulation at issue here.   Florida has specifically adopted the FDA regulations pertaining to generally recognized as safe (GRAS) status, including 21 CFR 182.10, which confers GRAS status to Grains of Paradise.[53]   Under Florida law, therefore, the ingredient is considered GRAS for use as a flavoring with no restrictions on its use.   When used as a flavor in liquor, it does not adulterate

---

[51]   *Lexington Mill & Elevator*, 232 U.S. 399 (1914).

[52]   *Id.* ("The addition of poisonous substances to an article of food in such minute quantities that the health of consumers cannot possibly be injured is not condemned by the provisions of the food and drugs act of June 30, 1906"); *id.* at 412 ("All the circumstances must be examined to see whether the article of food has been rendered injurious to health").

[53]   Fla. Admin. Code R. 5K-4.002(d) (stating that the FDA regulations at 21 CFR Parts 111-190 are "hereby incorporated and adopted as rules under the Florida Food Act").

the liquor; nor is it a substance "poisonous or injurious to health" within the meaning of Florida law.

Moreover, the statute, as interpreted by Plaintiff, is nonsensical.  There is no "ban" for the use of Grains of Paradise in any other food or beverage product, including other alcoholic beverages, such as beer.  As a simple internet exploration of Grains of Paradise will demonstrate, Grains of Paradise is readily available on grocery shelves as a spice. *See* Larissa Veronica Grains of Paradise Spice for sale at Wal-Mart (attached as Ex. 1).

## F. FDUTPA COUNTS II AND III SEEKING ACTUAL DAMAGES AGAINST WINN-DIXIE SHOULD BE DISMISSED FOR THE ADDITIONAL REASON THAT THE AMENDED COMPLAINT FAILS TO ALLEGE ANY ACTIVE INVOLVEMENT OR CONTROL BY WINN-DIXIE

The Amended Complaint fails to identify any deceptive or unfair act on the part of Winn-Dixie.  Rather, the justification for inclusion of Winn-Dixie as a defendant in this case is that, because Winn-Dixie purportedly sold Bombay Sapphire Gin, Winn-Dixie should also be held liable.[54]  But that is not what the law says.  Rather, FDUTPA specifically says that "damages, fees, or costs are not recoverable under this part against a retailer who has, in good faith, engaged in the dissemination of claims of a manufacturer or wholesaler without *actual knowledge* that it violated this part."  § 501.211(2), Fla. Stat. (emphasis added).

For example, in *Herazo v. Whole Foods Market, Inc.*, 2015 WL 4514510, No. 14-61909-CIV (S.D. Fla. July 23, 2015), the plaintiff sued Whole Foods, alleging that it used deceptive labels on its homeopathic products, in violation of FDUTPA.  The court explained that "[a]s a retailer of the subject homeopathic medicine, the statute engrafts a requirement that Defendant violated the act with actual knowledge. The complaint lacks an allegation that Defendant had actual knowledge it was violating the act."  *Id.* at *3, n.2.  Thus, the court found that "the claim [was] not properly pled under the statute."  *Id.*

Similarly, in *In re Hydroxycut Marketing and Sales Practices Litigation*, 299 F.R.D. 648 (S.D. Cal. Jan. 27, 2014), purchasers of certain weight-loss products brought a putative nationwide class action in California against manufacturer and retailer defendants, asserting violations of various state consumer protection laws, including FDUTPA.  The retailers moved to dismiss the consumer protection claims, in part, due to the complaint's failure to allege facts

---

[54]         As stated above, the Amended Complaint does not contain ascertainability or proof of purchase.

that establish that the retailers participated in or controlled representations that the plaintiffs heard or saw before purchasing the products.  The court explained that "[u]nder California law, a defendant's liability for unfair business practices must be based on his personal "participation in the unlawful practices" and "unbridled control" over the practices. . . . and that "[t]he concept of vicarious liability has no application to actions brought under the unfair business practices act" or the California Consumer Legal Remedies Act.  *Id.* at 656.  The court therefore dismissed the California consumer protection claims, as well as the FDUTPA claim (along with other state consumer protection claims), finding that "[b]ased on the Court's research, other states similarly require some sort of direct participation or control by a defendant to be held liable for deceptive business practices."  *Id.*  In addition, the court recognized that under Florida law, absent proof of the retailer's knowledge that it violated FDUTPA, damages, fees and costs are not recoverable, and only injunctive relief or declaratory judgment is maintainable.[55]

Here, as an initial matter, Plaintiff does not allege that Winn-Dixie participated in the purported unlawful action or that it had any control of it.  Rather, Plaintiff only makes conclusory assertions with respect to Winn-Dixie's purported knowledge, stating that Winn-Dixie "is a Florida corporation who with actual knowledge of the contents of the Adulterated Liquor, sold the Adulterated Liquor to the Plaintiff in Florida."  (Am. Compl. ¶ 9).  Plaintiff claims that "[b]y virtue of the bottle in which the Adulterated Liquor is produced and distributed by BACARDI and sold by WINN-DIXIE, WINN-DIXIE had a full understanding and knowledge of the ingredients of the Adulterated Liquor which included grains of paradise, in violation of Section 562.455, Fla. Stat. and Section 500.04(1)-(3)."  (*Id.* at ¶ 24).

---

[55]     California courts, interpreting the California consumer protection statute, which is similar to FDUTPA, routinely hold that retailers cannot be liable without actually engaging in wrongdoing itself. For example, in *Tortilla Factory LLC v. Better Booch LLC*, 2018 WL 4378700, Case No. 2:18-cv-02980 (C.D. Cal. Sept. 13, 2018), the court found that the claims against defendant distributors should be dismissed, reasoning that even though the plaintiff alleged that the distributors knew of Better Booch's alleged violations and provided substantial assistance to Better Booch, plaintiff provided no basis for this allegation aside from its "information and belief."  The court held that "Plaintiff certainly does not allege facts demonstrating defendant distributors' "personal 'participation in the unlawful practices' and 'unbridled control' over the practices."  Similarly, in *Perez v. Monster Inc*., 149 F. Supp. 3d 1176 (N.D. Cal. 2016), Best Buy moved to dismiss all claims asserted against it on the ground that plaintiff failed to adequately allege that it engaged in any wrongdoing or that it could be charged with the manufacturer's conduct.  The court ruled that "Once Mr. Perez's conclusory allegations are cast aside, Mr. Perez is basically left with the position that Best Buy is liable simply because it sells Monster's HDMI cables (*i.e.*, is a retailer for Monster). Mr. Perez has cited no authority to support the proposition that Best Buy can be held liable on this basis alone."  *Id.* at 1187.

30

These allegations do not adequately assert that Winn-Dixie had actual knowledge that it was violating FDUTPA, as is required under the statute.  Nor is there an allegation that Winn-Dixie even knew about the statute relating to Grains of Paradise.  Nor does the Plaintiff allege that Winn Dixie had actual knowledge that Grain of Paradise caused injury to individuals. Plaintiff's allegations simply relate to Winn-Dixie's purported knowledge that the product contained Grains of Paradise.  This is not sufficient.

In addition, the allegation regarding Winn-Dixie's knowledge that the product contained Grains of Paradise is plainly conclusory and insufficient for pleading a FDUTPA claim for damages against Winn-Dixie.  Other than pointing to the fact that the ingredients are listed on the bottle, the Amended Complaint provides no explanation or support for the conclusory allegation that Winn-Dixie had any understanding of the ingredients or whether or not Grains of Paradise "adulterated" the product.  Winn-Dixie cannot be expected to know about every single ingredient of every single product it sells.  Without more, this allegation is insufficient to establish Winn-Dixie's *actual* knowledge.

Therefore, the FDUTPA claim for actual damages against Winn-Dixie (Counts II and III) should be dismissed.

## III.   CONCLUSION

Wherefore, for the reasons stated, the Amended Complaint should be dismissed with prejudice.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(3)

Prior to filing Defendants' Motion to Dismiss Amended Complaint, counsel for the Defendants conferred with Plaintiff's counsel and is authorized to represent to the Court that Plaintiff does oppose the relief requested herein.

Respectfully submitted,

HOGAN LOVELLS US LLP
600 Brickell Avenue
Suite 2700
Miami, Florida 33131
Telephone:     (305) 459-6500

By: /s/ Marty Steinberg

Marty Steinberg
Fla. Bar No.: 187293
Email: marty.steinberg@hoganlovells.com
David Massey
Fla. Bar No.: 86129
Email: david.massey@hoganlovells.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 28, 2019 a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF. Copies of the foregoing document will be served upon interested counsel either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Marty Steinberg